## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| PAUL PREDZIK, | Civil No. 05-1063 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| SHELTER CORPORATION, INC., | |
| Defendant. | |

John A. Klassen, **JOHN A. KLASSEN, PA**, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, for plaintiff.

Janel M. Dressen and Richard T. Ostlund, **ANTHONY OSTLUND & BAER, PA**, 90 South Seventh Street, Suite 3600, Minneapolis, MN 55402, for defendant.

Plaintiff Paul Predzik brought this action against his former employer, Shelter Corporation, Inc. ("Shelter"), claiming retaliation in violation of the Fair Labor Standards Act and the Minnesota Whistleblower Act. Shelter now moves for summary judgment on both claims, and further moves for summary judgment on the issue of limited damages under the doctrine of after-acquired evidence. For the reasons discussed below, the Court denies Shelter's motion.

## BACKGROUND

Shelter is a Minnesota corporation that finances, develops, owns, and manages multi-unit housing throughout the United States. Predzik began working for Shelter on June 28, 2004, as the maintenance supervisor for Shelter's Cinnamon Ridge apartment complex in Eagan, Minnesota. As maintenance supervisor, Predzik's responsibilities included scheduling and completing work orders, supervising other maintenance personnel, and communicating maintenance needs and other areas of concern to the property manager. At that time, Predzik entered into a residential lease at Cinnamon Ridge and received a discounted rental rate as part of his benefits package. Predzik worked and resided at Cinnamon Ridge until January 20, 2005, when Shelter terminated his employment.

In early September 2004, Predzik approached the Cinnamon Ridge property manager, Kris Bergstrom, to discuss whether Shelter was required to pay him overtime wages for weeks in which he worked more than 40 hours. Predzik indicated that he believed Shelter owed him overtime pay, and Bergstrom informed him that he would not receive those wages because he was classified as an exempt employee. At that meeting, Predzik also informed Bergstrom that he would check with the United States Department of Labor about his rights.

Approximately two weeks after the meeting, on September 25, Shelter issued a written "Disciplinary Action" against Predzik for poor job performance. This warning included complaints that Predzik repeatedly failed to pay his rent on time and in full, failed to maintain adequate contact with the property manager, and inadequately

organized and completed work orders. The document indicates that it was Predzik's second warning, but there is no first written warning in the record.[1] Approximately one week later, on October 1, Predzik received an evaluation that noted a number of the same concerns mentioned in the September 25 disciplinary action. This evaluation was an overall assessment of Predzik's work performance during his first 90 days as a Shelter employee, and it concluded that he was not adequately performing his responsibilities. Ten days later, on October 12, Predzik received another written "Disciplinary Action" – this one labeled as a "final warning" – repeating many of the same concerns about his job performance and incomplete rent payments.

According to Predzik, negative evaluations "just started coming up" after his meeting with Bergstrom in early September. A former Shelter employee, Lori Harms, met with Bergstrom around the time that Predzik complained to Bergstrom about Shelter's failure to pay him overtime wages. According to Harms, Bergstrom told her that Cinnamon Ridge management needed to "put paper on" Predzik. (Harms Dep. at 43.) Harms understood this instruction to mean that she was to "create a false justification for firing [Predzik]" because he had contacted authorities about his right to receive overtime pay. (Harms Aff. ¶ 6-7.)

In October 2004, Predzik formally reported Shelter to the United States Department of Labor. On October 18, Predzik wrote to Bergstrom and informed her that

---

[1] Bergstrom testified that she communicated with Predzik about his performance and gave him at least one verbal warning sometime before he received the September 25 "Disciplinary Action." She also testified that he failed to adequately perform his duties throughout his employment with Shelter.

he had contacted the Department of Labor concerning his questions about overtime pay. Four days later, Shelter began advertising for a replacement for Predzik's job at Cinnamon Ridge.

The Department of Labor eventually found Shelter to be in violation of the Fair Labor Standards Act for having wrongly classified certain employees as exempt. Shelter reclassified its employees in accordance with the findings, and distributed $1,075.24 to Predzik in previously unpaid overtime on December 28, 2004. Three weeks later, on January 20, 2005, Shelter terminated Predzik, citing his poor job performance as the reason for his discharge.

On May 16, 2005, Predzik filed a complaint in state court, claiming retaliation in violation of the Fair Labor Standards Act and the Minnesota Whistleblower Act. Shelter removed the case to this Court on June 2, 2005. On March 13, 2006, Shelter filed a motion for summary judgment.

**ANALYSIS**

**I.    STANDARD OF REVIEW**

Summary judgment is appropriate in the absence of any genuine issue of material fact and when the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the

light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     RETALIATION CLAIMS

Predzik asserts that Shelter retaliated against him in violation of the Fair Labor Standards Act and the Minnesota Whistleblower Act.  The Fair Labor Standards Act makes it unlawful for an employer "to discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3).  The Minnesota Whistleblower Statute provides that "[a]n employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because . . . the employee … in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official."  Minn. Stat. § 181.932, subd. 1(a).

### A.     The *Price Waterhouse* Analysis

The parties dispute whether retaliation claims under Fair Labor Standards Act and Minnesota Whistleblower Act can be analyzed under the framework  adopted in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 270-272 (1989).  Under the *Price Waterhouse* analysis, if the employee can demonstrate direct evidence of an illegitimate motive by an employer, then the burden of proof rests with the employer to demonstrate by a

preponderance of the evidence that the same decision would have been made had there been no illegitimate motive. *Id.* at 276. Predzik relies on Bergstrom's statements to Harms as direct evidence of unlawful retaliation and therefore urges application of the *Price Waterhouse* analysis. Harms testified that Bergstrom told her to "put paper" on Predzik, and Harms understood these statements to be instructions to falsely justify Predzik's impending termination.

As discussed below, the Court finds that the indirect evidence presented by Predzik is sufficient to survive defendant's motion for summary judgment under the burden-shifting analysis of *McDonnell Douglas*. As such, the Court need not determine whether the *Price Waterhouse* analysis can be appropriately applied to claims under the Minnesota Whistleblower Act or the Fair Labor Standards Act, and whether Bergstrom's instructions to Harms are direct evidence of unlawful retaliation that might warrant application of the *Price Waterhouse* analysis.[2]

---

[2] The Court has found no cases applying the *Price Waterhouse* analysis to claims under the Minnesota Whistleblower Act. *See Calvit v. Minneapolis Pub. Sch.*, 122 F.3d 1112, 1118 (8th Cir. 1997) ("Minnesota follows the test set out in *McDonnell Douglas* . . . when analyzing a claim under the whistleblower statute."). Indeed, Minnesota courts have explicitly rejected use of the *Price Waterhouse* analysis for discrimination claims under the Minnesota Human Rights Act. *See Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 624 (Minn. 1988). However, some federal courts have indicated that the *Price Waterhouse* approach can be applied to a Fair Labor Standards Act retaliation claim under certain circumstances. *See, e.g.*, *Conner v. Schnuck Markets*, 906 F. Supp. 606, 612 (D. Kan. 1995) ("It is true that the shifting allocation of the burdens of proof and production set forth in *McDonnell Douglas* does not apply in cases where plaintiff can show direct evidence of the discriminatory basis for the challenged employment decision.").

**B.     The *McDonnell Douglas* Analysis**

The three-stage burden shifting analysis of *McDonnell Douglas* is regularly used for retaliation claims brought under the Minnesota Whistleblower Act and the Fair Labor Standards Act.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005) (applying the burden shifting framework to analyze a retaliatory discharge claim under the Fair Labor Standards Act). *Nichols v. Metro Ctr. for Indep. Living, Inc.*, 50 F.3d 514, 516 (8th Cir. 1995) (applying the burden shifting framework to analyze a retaliatory discharge claim under the Minnesota Whistleblower Act).

Under the *McDonnell Douglas* analysis, Predzik must first demonstrate a prima facie case of retaliation by showing (1) that he engaged in protected conduct; (2) that he suffered an adverse employment action; and (3) that a causal connection exists between the two.  *See Grey*, 396 F.3d at 1034; *Ring v. Sears, Roebuck & Co.*, 250 F. Supp. 2d 1130, 1135 (D. Minn. 2003).  If Predzik establishes a genuine fact dispute on these elements, the burden shifts to the defendant to articulate a legitimate, non-retaliatory basis for the adverse employment action.  *See Grey*, 396 F.3d at 1035; *Ring*, 250 F. Supp. 2d at 1137.  Then the burden shifts back to Predzik to create a genuine issue of material fact on the question of whether the articulated reason is a pretext for unlawful retaliation. *See Grey*, 396 F.3d at 1035; *Ring*, 250 F. Supp. 2d at 1137.

**1.     Prima Facie Case**

Predzik must first show that he engaged in protected conduct. His formal report to the Department of Labor is clearly protected conduct. Predzik also made an internal complaint. Specifically, Predzik complained to Bergstrom in early September 2004 about Shelter's failure to pay him overtime wages, and told Bergstrom that he intended to investigate his rights with the Department of Labor. The Court concludes that this internal complaint is also protected activity under both relevant statutes. *See* 29 U.S.C. § 215(a)(3) (protecting employees who have "filed any complaint" or "instituted or cause to be instituted any proceeding" under the Fair Labor Standards Act); Minn. Stat. § 181.932 (specifically protecting "reports" of violations of federal or state law "to an employer"); *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 180-83 (8th Cir. 1975) (holding that employee engaged in protected conduct under Fair Labor Standards Act by making a verbal allegation at work that her rights under the Act were being violated).

Second, Predzik must show that he suffered an adverse employment action. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Mo. Dep't of Corr. and Human Res.*, 210 F.3d 850, 853 (8th Cir. 2000). Negative performance reviews, or "papering" of an employee's personnel file, can be adverse employment actions "only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms and conditions of the recipient's employment." *Id.* at 854.

The parties do not dispute that an adverse employment action occurred when Shelter terminated Predzik on January 20, 2005. The parties dispute, however, whether

the negative performance evaluations of Predzik qualify as adverse employment actions. The record indicates that the negative performance evaluations became a part of Predzik's personnel file, and that Shelter cited poor job performance as the basis for his termination.  Based on these facts, there is sufficient evidence upon which a reasonable jury could conclude that the negative reviews were used "as a basis to detrimentally alter the terms and conditions of [his] employment," and may therefore qualify as adverse employment action.  *Id.*

Finally, Predzik must demonstrate a causal link between the protected conduct and the adverse employment action.  *See Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (discussing sufficiency of evidence required to establish a causal link).  For the timing between protected conduct and an adverse employment action to support such an inference, the two events must be closely linked.  *See Nelson v. J.C. Penny Co.*, 75 F.3d 343, 346-47 (8th Cir. 1996) (holding that a one month interval between protected conduct and adverse employment action was too long to support an inference of causation); *EEOC v. Kohler Co.*, 335 F.3d 766, 774-75 (8th Cir. 2003) (holding time period of "less than one month" sufficient to support inference of causation).

Here, it is undisputed that in early September (on or about September 6) Predzik made an internal complaint to Bergstrom about Shelter's failure to pay him overtime wages.  It is also undisputed that Predzik received his first of several written negative performance reviews on September 25, less than three weeks later.  The Court finds that the temporal connection between the undisputed evidence of the internal complaint and

that of the September 25 disciplinary action is close enough that a reasonable jury could infer that the two were causally linked.

### 2.    Legitimate, Non-Discriminatory Basis

Shelter asserts a legitimate, non-discriminatory basis for terminating Predzik. Namely, Shelter points to his record of poor performance as maintenance supervisor. As such, Shelter has met its burden at this stage of the *McDonnell Douglas* analysis.

### 3.    Pretext

Finally, to survive summary judgment Predzik must present sufficient evidence upon which a reasonable jury could conclude that Shelter's proffered non-retaliatory reason was a pretext for an unlawful termination. In determining whether a plaintiff has shown pretext, the question is not whether the plaintiff "actually did what he was accused of doing or whether discharge was warranted." *Grey*, 396 F.3d at 1035. Rather, the relevant inquiry is whether the employer *believed* the employee was guilty of the conduct justifying the discharge. *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2001). Where the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights under the Fair Labor Standards Act, the discharge is discriminatory whether or not other grounds for discharge exist. *Brennan v. Maxey's Yamaha*, 513 F.2d 179, 181 (8th Cir. 1975).

Predzik primarily relies upon the testimony of Harms to establish pretext. Harms testified that Bergstrom told her that she "needed to put paper on [Predzik]." (Harms Dep. at 43.) Harms understood this instruction to mean that she was to "create a false

justification for firing [Predzik]" because he had contacted authorities about his right to receive overtime pay.[3] (Harms Aff. ¶ 6-7.) In addition, Predzik testified that the negative performance reports "just started coming up" after he made the internal complaint to Bergstrom. His statement is corroborated by the fact that his personnel file contains no negative evaluations prior to his meeting with Bergstrom.

Shelter has extensive evidence that Predzik was not performing his job adequately. Given this record of poor performance, the showing of pretext by Predzik is not compelling. However, the Court finds that the evidence presented by Predzik is sufficient for a reasonable jury to conclude that Shelter's proffered reason for discharging Predzik was pretextual.

## III. AFTER-ACQUIRED EVIDENCE

Shelter has also moved for summary judgment on the basis that Predzik's damages should be limited under the doctrine of after-acquired evidence because plaintiff allegedly falsified his job application upon applying for the job with Shelter. If invoked, the after-acquired evidence doctrine operates to limit the remedies available to a plaintiff. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 363 (1995). To invoke the doctrine, the employer must establish "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had

---

[3] Shelter argues that the Harms affidavit should be disregarded because it conflicts with her earlier deposition testimony. *See Plymouth Foam Prods., Inc. v. City of Becker*, 120 F.3d 153, 155 n.3 (8th Cir. 1997). Although Harms admits in her deposition that she never falsified records in Predzik's file, she states in both her affidavit and her deposition that Bergstrom told her to "paper" Predzik's personnel file. The Court finds no direct conflict in her testimony.

known of it at the time of the discharge." *Id.* The employer has a "substantial burden" to show that there is a "settled" company policy that a particular employee would have "in fact" been fired based on the alleged misconduct. *Waag v. Thomas, Pontiac, Buick, GMC, Inc.*, 930 F. Supp. 393, 408-09 (D. Minn. 1996). Such misconduct can include falsification of information on a job application. *See e.g., Chang v. Cargill*, 168 F. Supp. 2d 1003, 1009 n.2 (D. Minn. 2001).

Shelter presented undisputed evidence that Predzik misrepresented periods of unemployment and omitted a very short term of employment with one company on his job application. Shelter also submitted testimony of three employees who explained how this information would have affected Predzik's employment with Shelter. For example, Shelter's former human resources manager stated that this information would have resulted in his termination, and that Shelter has terminated employees for such misrepresentations in the past. Shelter's employee handbook, however, states that an employee "may" be terminated based on the discovery of falsified information in his employment application.

In light of the equivocating language contained in the employee handbook, the testimony of Shelter employees are insufficient to satisfy Shelter's substantial burden to establish a "settled" company policy. *See Waag*, 930 F. Supp. at 408-09. Shelter is free to argue the issue of limiting damages at trial, but the Court finds Shelter's showing of after-acquired evidence insufficient to grant its motion for summary judgment on that basis.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 22] is **DENIED.**

DATED: September 27, 2006            s/ John R. Tunheim
at Minneapolis, Minnesota.            JOHN R. TUNHEIM
                                                  United States District Judge